Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| CESAR CORDERO MONTALVO

Apelante


v.


METRO DE PUERTO RICO H/N/C METRO PR Y OTROS

Apelada | KLAN202500356 | APELACIÓN procedente del Tribunal de Primera Instancia, Sala Superior de San Juan

Civil Núm.: SJ2022CV06697

Por: Daños y perjuicios; Libelo; Calumnia o difamación |
|---|---|---|

Panel integrado por su presidente, el Juez Hernández Sánchez, la Jueza Mateu Meléndez y la Juez Lotti Rodríguez.[1]

Lotti Rodríguez, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 27 de agosto de 2025.

Comparece ante este foro el Sr. César D. Cordero Montalvo (señor Cordero Montalvo o "el apelante") y nos solicita que revoquemos la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan, notificada el 31 de enero de 2025. Mediante el referido dictamen, el foro primario declaró Ha Lugar las cuatro solicitudes de sentencia sumaria respectivamente promovidas por la Sra. Fabiana I. Marini Martínez, el Sr. Orlando E. Ramos Rosado, Metro Puerto Rico LLC h/n/c, el Sr. Jorge L. Rivera Velázquez y el Sr. Eliud R. Rivas Hernández ("parte apelada").

Por los fundamentos que expondremos a continuación, se *confirma* la *Sentencia* apelada.

I.

El 26 de julio de 2022, el señor Cordero Montalvo, catedrático jubilado de la Universidad de Puerto Rico y exrector de la UPR-

---

[1] Conforme a la OATA-2025-078 del 14 de mayo de 2025, la Hon. Glorianne M. Lotti Rodríguez sustituyó al Hon. Fernando J. Bonilla Ortiz.

Recinto de Utuado, presentó una *Demanda* de daños y perjuicios por difamación en contra del periódico Metro Puerto Rico, LLC (Metro), la Presidenta del Consejo General de Estudiantes de UPR-Recinto de Río Piedras entre el 2020-2022, Sra. Marini Martínez, el Presidente General de Estudiantes de la UPR-Recinto de Mayagüez entre el 2021-2022, Sr. Ramos Rosado, los representantes estudiantiles ante la Junta de Gobierno de la UPR en ese entonces, Sr. Rivera Velázquez y Sr. Rivas Fernández, Fulano de Tal y Compañía de Seguros A.

El 17 de agosto de 2022, el señor Cordero Montalvo presentó una *Demanda Enmendada.* Alegó que "el cúmulo de información e imputaciones falsas diseminada por los demandados generó una opinión pública desfavorable [sobre su persona], y presión a los integrantes de la Junta de Gobierno, para que [el 30 de julio de 2021] dejaran sin efecto el nombramiento de este a la Presidencia Interina de la UPR".[2] Adujo, en esencia, que se difundió deliberadamente que este había cometido actos de corrupción en el ejercicio de su cargo como rector del Recinto de Utuado, además de haber incurrido en actos de hostigamiento sexual contra sus estudiantes y encubrimiento de casos de hostigamiento.

Respecto a Metro, el Sr. Cordero Montalvo alegó que el periódico publicó notas periodísticas con información falsa. Específicamente, sostuvo que la noticia del 25 de julio de 2021 le identificó falsamente como el autor de irregularidades ("mal manejo de liquidaciones del personal") mientras ocupó el cargo de rector del Recinto de Utuado, y que la noticia del 30 de julio de 2021 le atribuyó falsamente "múltiples señalamientos [de] hostigamiento". Afirmó que, la información publicada es libelo de su faz, al carecer de respaldo tanto del Informe de Auditoria rendido por la Oficina del

---

[2] Apéndice 1 del recurso, págs. 1-17.

Contralor de Puerto Rico como de los récords oficiales de la UPR. Además, sostuvo que Metro incumplió con su deber de diligencia al no corroborar la veracidad de la información publicada ni al brindarle la oportunidad de responder o aclarar dicha información.

En lo que concierne al resto de los apelados, Marini Martínez, Ramos Rosado, Rivera Velázquez y Rivas Hernández, el señor Cordero Montalvo alegó que estos provocaron que se publicara la presunta información difamatoria en varios foros de prensa, además de difundirla en las plataformas digitales [*Facebook* y *Twitter*]. Arguyó que estos difundieron información e imputaciones falsas contra su persona "de manera deliberada, con malicia premeditada en su interés de descarrillar [su] nombramiento a la posición de Presidente interino de la UPR o lograr que su nombramiento fuera retirado".[3]

En consecuencia, solicitó remedios contra los apelados por daños a su reputación, el menoscabo de relaciones en la comunidad, angustias mentales y emocionales, por una suma no menor de $500,000.00. Además, solicitó indemnización por la perdida de salario y beneficios asociados al puesto de la presidencia interina de la UPR, también por una suma no menor de $200,000.00.

Luego de diversos trámites procesales, el 3 de junio de 2024, la Sra. Marini Martínez presentó una *Moción en Solicitud de Sentencia Sumaria*. En ese mismo mes, las demás partes apeladas presentaron sus respectivas solicitudes de sentencia sumaria. En términos generales, sostuvieron que el señor Cordero Montalvo carece de prueba suficiente para establecer su causa de acción por difamación, al no demostrar que la información era falsa, que sufrió daños reales, ni que las expresiones emitidas se realizaron con grave menosprecio de la verdad.

---

[3] *Id.*

El 17 de julio de 2024, el señor Cordero Montalvo presentó una *Moción In Limine de la Moción de Sentencia Sumaria de Metro y/o para solicitar remedios al amparo de la Regla 36.6 de Procedimiento Civil.*[4] Solicitó en síntesis, autorización para tomar deposiciones a los testigos que Metro notificó, aduciendo que se encuentra en un estado de indefensión ante las alegaciones formuladas por dicho periódico en su solicitud de sentencia sumaria. Manifestó que dichas deposiciones "fueron programadas dentro del plazo fijado. . .para efectuar el descubrimiento de prueba y luego canceladas por acuerdo de los abogados de las partes, para conducir conversaciones de transacción entre estos".[5] (Énfasis omitido).

El 29 de julio de 2024, el apelado Metro presentó su *Oposición a Moción In Limine de la Moción de Sentencia Sumaria de Metro y/o para Solicitar Remedios al Amparo de la Regla 36.6 de Procedimiento Civil.*[6] Afirmó que el señor Cordero Montalvo tuvo la oportunidad de deponer a los testigos de Metro, pero optó por no hacerlo. Expresó que las conversaciones transaccionales entre las partes no constituyen un impedimento para llevar a cabo o detener el descubrimiento de prueba necesario. Asimismo, argumentó que, aunque las deposiciones fueron programadas en varias ocasiones, estas se cancelaron por razones no imputables a Metro. Por tanto, instó al tribunal a confirmar que el periodo de descubrimiento de prueba concluyó.

El 30 de julio de 2024, el foro *a quo* emitió una *Orden* en la que declaró No Ha Lugar la *Moción In Limine.*[7] Mediante dicho dictamen, entre otros asuntos, el tribunal indicó que se concedieron varias prórrogas al período de descubrimiento de prueba, el cual

---

[4] Apéndice 20 del recurso, págs. 1043-1048.
[5] *Id.*
[6] Apéndice 22 del recurso, págs. 1050-1083.
[7] Apéndice 22-A del recurso, págs. 1083a-1083b.

finalmente concluyó. Por tal razón, se autorizó la presentación de las mociones dispositivas. Así las cosas, el Tribunal no halló razón para permitir deposiciones que la parte apelante decidió no llevar a cabo durante el término concedido para ello.

El 7 de agosto de 2024, el señor Cordero Montalvo presentó una *Urgente Solicitud De Reconsideración De Orden Mediante la cual se Deniegan Remedios al Amparo de la Regla 36.6 de Procedimiento Civil*,[8] la cual fue declarada No Ha Lugar por el Tribunal mediante *Resolución* emitida el 15 de agosto de 2024.[9] Dicho foro denegó la solicitud del apelante para "reabrir el descubrimiento de prueba"[10] y le concedió veinte (20) días para que presente su posición en cuanto a las mociones dispositivas.

En respuesta, el 4 de septiembre de 2024, el señor Cordero Montalvo presentó su *Oposición a las Solicitudes de Sentencia Sumaria.*[11] El 30 de junio de 2025, notificada el 31, el Tribunal de Primera Instancia dictó *Sentencia Sumaria.*[12] Por su importancia, transcribimos íntegramente las determinaciones de hechos sobre las que basó su dictamen.

**A. Determinaciones sobre hechos comunes en cuanto a todas las mociones dispositivas**

1. El demandante César D. Cordero Montalvo es mayor de edad, soltero y profesor jubilado de la UPR.[13]

2. Cordero Montalvo fue catedrático de la UPR, trabajando en distintas capacidades y puestos desde el 1977 hasta el 2020, tales como Rector del Recinto de Utuado, Decano de Asuntos Académicos y Ayudante Ejecutivo del Rector en el Recinto de Río Piedras, Director Asociado de Asuntos Académicos en la

---

[8] Apéndice 23 del recurso, págs. 1084-1126.
[9] Apéndice 26 del recurso, pág. 1138.
[10] *Id.*
[11] Apéndice 27 del recurso, págs. 1139-1239.
[12] Apéndice 29 del recurso, págs. 2038-2104.
[13] Se omite la transcripción de las notas al calce del texto original debido a su extensión. No obstante, cabe destacar que, por cada determinación de hecho, el foro primario indicó expresamente la fuente de la cual emana la información.

Administración Central, y Decano de Asuntos Académicos del Recinto de Cayey.

3. Cordero Montalvo fungió como Rector Interino y Rector en propiedad en el Recinto de Utuado entre los años 2004 y 2009.

4. Cordero Montalvo impartió cursos en el Departamento de Ciencias Físicas de la Facultad de Estudios Generales, Recinto de Río Piedras (en adelante, "UPR-RP") entre los años 1998 al 2004 y del 2009 al 2020.

5. El 5 de abril del 2018, el demandante impartió una clase de Ciencias Físicas en la UPR-RP en la cual había entre quince (15) y diecisiete (17) estudiantes.

6. Durante el curso del 5 de abril, el Dr. Cordero llevó a cabo, lo que él describe, como una "demostración" de nuestro sistema solar.

7. Cordero Montalvo preguntó a una de sus estudiantes si podía utilizar su cabello largo y rizado para realizar la "demostración" del sistema solar y, según el demandante, ésta accedió.

8. Habiendo accedido la estudiante, el demandante se le acercó y tocó su cabello.

9. Acto seguido, Cordero Montalvo utilizó la expresión "rizos de oro" para denominar la ubicación del planeta Tierra en el sistema solar.

10. Cordero Montalvo se jubiló de la UPR el 1 de enero de 2021. Desde entonces no ha tenido un trabajo, y su fuente principal de ingreso es su pensión como jubilado, además de los ingresos del seguro social.

11. En o alrededor del 2 de julio de 2021, la Junta de Gobierno de la UPR destituyó a su presidente, doctor Jorge Haddock.

12. El Dr. Haddock ocuparía el cargo de presidente hasta el 31 de julio de 2021, de modo que su sucesor interino debía estar seleccionado antes de esa fecha, para iniciar su desempeño el 1ro de agosto de 2021.

13. Con posterioridad a la destitución del Dr. Haddock, la Junta de Gobierno de la UPR designó un "Comité de Búsqueda y Consulta" con el propósito de identificar y recomendar candidatos a la presidencia interina de la UPR mientras se conducían los procesos dirigidos a la

selección de un presidente en propiedad para dirigir la institución.

14. El Comité de Búsqueda y Consulta fue presidido por la Dra. Mayda Velasco Bonilla, vicepresidenta de la Junta de Gobierno, y tenía como miembros adicionales al ingeniero Emilio Colón Beltrán, presidente de la Junta de Gobierno, al Lcdo. Antonio Monroig Maltrasi, la Dra. Margarita Villamil Torres y a Rivas Hernández, todos integrantes de la Junta de Gobierno.

15. El Comité estaría a cargo de evaluar a los/as candidatos a la Presidencia Interina de la UPR. Los/as candidatos/as debían ser catedráticos/as de la UPR, no podrían ser miembros/as corrientes de la Administración Central, Vicepresidencias o Rectorías de la UPR, y no podrían someter una candidatura para el proceso de presidente en propiedad.

16. Uno de los requisitos para aspirar a la presidencia interina de la UPR era que la persona seleccionada no podría luego aspirar al puesto en propiedad.

17. Entre las personas que el Comité de Búsqueda y Consulta identificó como candidatos para ocupar la presidencia interina de la UPR, se incluyó al Dr. Cordero Montalvo.

18. Cordero Montalvo fue considerado para presidir la UPR en, al menos, tres (3) ocasiones, incluyendo durante el verano de 2021.

19. En o alrededor del 19 de julio de 2021, la comunidad universitaria de la UPR conoció que uno de los candidatos que estaba siendo considerado por la Junta era el demandante, Cordero Montalvo.

20. El 23 de julio de 2021, se remitió a los integrantes de la Junta de Gobierno de la UPR los curriculum vitae presentados por Cordero Montalvo y el Dr. Weiner.

21. Los consejos de estudiantes de los recintos de la UPR, incluyendo el CGERUM, participaron, de manera informal, en el proceso de búsqueda y consulta para la selección de un Presidente interino de la UPR, a través de la Confederación Estudiantil Nacional (CEN).

22. El proceso de selección del presidente interino fue uno acelerado, al punto de impedir que no todos los

consejos generales de estudiantes pudieron expresarse a tiempo.

23. El 26 de julio de 2021, el Comité de Búsqueda y Consulta rindió un reporte a la Junta de Gobierno de la UPR. El informe resume los trabajos realizados y recomendó a dos candidatos a la presidencia interina de la UPR: el Dr. Cordero Montalvo, recomendado por el comité de manera unánime, y el Dr. Weiner, recomendado por tres (3) de los cinco (5) integrantes del comité.

24. Coetáneamente, el 26 de julio de 2021, se llevó a cabo una reunión extraordinaria de la Junta de Gobierno de la UPR, cuyo propósito era considerar los hallazgos del Comité de Búsqueda y Consulta e intentar seleccionar a uno de los candidatos recomendados para ocupar interinamente el puesto de presidente de la UPR.

25. Tras ser acogido el informe, el pleno de la Junta votó entre los dos candidatos allí identificados.

26. Durante la reunión extraordinaria de la Junta de Gobierno de la UPR efectuada el 26 de julio de 2021, por una mayoría de nueve (9) votos a favor y cinco (5) en contra, se acogió el informe de recomendación de candidatos para la presidencia interina de la institución del Comité de Búsqueda y Consulta.

27. Los integrantes de la Junta de Gobierno que votaron a favor del demandante fueron el presidente Emilio Colón Beltrán, la vicepresidenta Mayda Velasco Soto, las representantes claustrales Margarita Villamil y Lourdes Soto, y los representantes estudiantiles, ahora codemandados, Eliud Rivas Hernández y Jorge Rivera Velázquez.

28. Como resultado de todo lo anterior, el 26 de julio de 2021, la Junta de Gobierno de la UPR expidió la Certificación Núm. 3 (2021-2022), mediante la cual designó al Dr. Cordero Montalvo como presidente interino de la UPR, efectivo al 1 de agosto de 2021.

29. En la noche del 26 de julio, el Dr. Cordero Montalvo fue designado presidente interino de la UPR **con posterioridad** a la publicación del comunicado de prensa de Rivera Velázquez y Rivas Hernández y la nota

publicada en el periódico Metro cubriendo esa noticia. (Énfasis suplido).

30. El 26 y 27 de julio de 2021, el licenciado Eliezer Ramos Parés, el Dr. Hernán Cestero y el Dr. Jorge Valentín enviaron correos electrónicos a los integrantes de la Junta de Gobierno de la UPR mediante los cuales **cuestionaron y solicitaron reconsideración** de la certificación del Dr. Cordero Montalvo como presidente interino de la UPR, debido a que surgieron interrogantes sobre la definición de qué constituía una mayoría necesaria para elegir a una persona como presidente de la UPR. (Énfasis suplido).

31. <u>Posterior a la elección</u>, más tarde en la noche del 26 de julio de 2021, se publicaron varias notas periodísticas, incluyendo del periódico nacional El Nuevo Día y el periódico estudiantil Pulso Estudiantil, sobre la selección del Dr. Cordero. (Subrayado nuestro).

32. Estas noticias reportaban, entre varios temas, sobre un informe llevado a cabo por la Oficina del Contralor de Puerto Rico mientras el Dr. Cordero fungió como rector de la UPR de Utuado.

33. Según los reportajes, el Dr. Cordero había sido señalado de presuntas irregularidades durante su incumbencia en relación con los comunicados, actividades y gestiones que llevaba a cabo como rector de Utuado, como, por ejemplo, haber emitido pagos indebidos de licencias acumuladas.

34. El 30 de julio de 2021, la Junta de Gobierno de la UPR resolvió dejar sin efecto la selección del Dr. Cordero como Presidente interino.

35. El 16 de agosto de 2021, el Dr. Cordero envió una comunicación a los componentes del Comité de Búsqueda y Consulta titulada "Expresiones en torno a mi reciente disponibilidad para la presidencia interina de la UPR (ampliadas)".

36. Al final del referido escrito, el Demandante expresó lo siguiente:

> Me brindó gran satisfacción colaborar con las compañeras y compañeros universitarios que propusieron o respaldaron que hiciera disponible mi experiencia para servir una vez más a la

institución. Reconozco, como ya indiqué, que es el cuestionamiento una estrategia esperada y potencialmente útil para ampliar el conocimiento, si se conduce adecuadamente. Pero, hay que estar consciente de que también se abre a planteamientos distorsionados o falsos, formulados muy ligeramente sin proveer la oportunidad adecuada para la réplica, que también forman parte del precio a pagar por la disponibilidad misma a contribuir al deseo de hacer algo bueno.

37. El Dr. Cordero envió una versión modificada de esta "comunicación expositiva" a varios medios de prensa, periodistas, "colegas del claustro del Sistema UPR" y "amistades del pasado".

38. El 16 de agosto de 2021, el Dr. Cordero Montalvo participó de una entrevista de aproximadamente ocho minutos en el programa "Tiempo Igual", de los periodistas Luis Penchi e Ismael Torres, para conversar sobre el proceso relacionado a su aspiración a la presidencia interina de la UPR.

39. Cordero Montalvo se abstuvo de contactar a Marini Martínez y a los representantes estudiantiles Rivas Hernández y Rivera Velázquez, tras la divulgación del señalamiento de hostigamiento sexual.

40. Cordero Montalvo declaró que no ha reclamado pérdida alguna por ingresos dejados de percibir a raíz del colapso de su nombramiento como presidente interino de la UPR, ni posee un informe que pruebe sus alegados daños pecuniarios.

41. Cordero Montalvo no consultó a conocedores del área de las comunicaciones, para auscultar si su reputación pudo afectarse por lo que la demandada publicó.

42. El Dr. Cordero Montalvo no tomó medicamentos para condición emocional alguna como resultado de las publicaciones que motivaron la presentación de la demanda.

43. El Dr. Cordero Montalvo sólo buscó ayuda sicológica informal con un siquiatra jubilado que conoce de hace años, cuyo nombre se negó a proveer, como resultado

de las publicaciones que motivaron la presentación de la demanda.

44. Cordero Montalvo se abstuvo de contactar a miembros de la comunidad universitaria para saber si habían creído lo publicado por la demandada o no.

45. El Dr. Cordero Montalvo no tomó ninguna acción legal contra la UPR luego que se dejara sin efecto su designación como presidente interino.

46. El Dr. Cordero Montalvo reconoce que el tema de la selección de un presidente interino de la UPR es un asunto de interés para el pueblo de Puerto Rico.

47. El Dr. Cordero es una **figura pública**. (Énfasis suplido).

**B. Determinaciones de hechos pertinentes a moción dispositiva presentada por Marini Martínez**

48. La demandada Fabiana Marini Martínez fungió como miembro del CGE del recinto de Río Piedras de la UPR, desde el año 2019 hasta que se graduó en el 2022.

49. Marini Martínez asumió la presidencia del CGE del recinto de Río Piedras en abril del 2021 hasta mayo del 2022.

50. El 26 de julio de 2021 y tras enterarse de la republicación en Twitter de lo que la estudiante de Cordero Montalvo divulgó originalmente el 5 de abril del 2018, la demandada la contactó para corroborar que se estaba refiriendo a aquél.

51. Marini Martínez y la estudiante del demandante se conocían previo al 26 de julio de 2021, ya que la segunda también era miembro del CGE del recinto de Río Piedras.

52. El 27 de julio de 2021 el CGE del recinto de Río Piedras de la UPR emitió un comunicado que fue difundido a los medios de prensa.

53. En ese comunicado el cuerpo estudiantil manifestó su rechazo a la selección del demandante como presidente interino de la UPR.

54. Aparte de criticar la falta de transparencia en el proceso de selección, en el comunicado en cuestión se expresó, inter alia, lo siguiente:

El Consejo General de Estudiantes rechaza el nombramiento del Dr. César Cordero como

presidente interino por la falta de transparencia en el proceso, su controvertible historial administrativo y las recientes acusaciones tanto de acoso hacia estudiantes como de encubrimiento de casos.

"Es inaceptable que una persona señalada por recibir pagos indebidos y catalogada como mal administrador por falta de controles internos se considere para la presidencia de la Universidad. Sin embargo, lo más frustrante resulta que la comunidad universitaria se entere, por denuncias en las redes sociales, que el presidente interino es un acosador sexual. No podemos permitir que los hostigadores y acosadores sigan por la vía libre en nuestro sistema universitario." Denunció Fabiana Marini, presidenta del Consejo General de Estudiantes del recinto riopedrense.

55. Ese comunicado fue de la autoría de Marini Martínez como presidenta del CGE, y de otro estudiante, siendo la primera quien lo divulgó a la prensa.

**C. Determinaciones de hechos pertinentes a moción dispositiva presentada por Ramos Rosado**

56. Durante el verano de 2021, el joven universitario y codemandado, Orlando E. Ramos Rosado, fungía como presidente interino del Consejo General de Estudiantes (CGE) del Recinto Universitario de Mayagüez (RUM) de la Universidad de Puerto Rico.

57. El 26 de julio de 2021, los representantes estudiantiles ante la Junta de Gobierno solicitaron, de manera informal, insumo a los miembros de los Consejos Generales de Estudiantes de todos los recintos "para tener una idea de por quién votarían, si tuviesen derecho a ello, en la elección a la presidencia interina de la Universidad".

58. Ese mismo día, el codemandado Ramos Rosado, en consulta con los representantes estudiantiles ante la Junta de Gobierno, expresó que "de ser por nosotros, favoreceríamos la selección del Dr. César Cordero por encima de otros/as candidatos/as".

59. Luego de esa comunicación, el codemandado Ramos Rosado informó a la composición interina del CGE-RUM que "mediante una votación informal [pidieron] que diera un insumo positivo a la figura del Dr. Cordero y que este servidor, a nombre del CGE-RUM, votó a favor de él".

60. Ramos Rosado tuvo acceso esa noche a los reportajes antes mencionados, así como a otra nota del periódico Metro con fecha del 10 de julio de 2013 que recogía otros detalles reseñados en el informe del Contralor sobre los señalamientos de que el Dr. Cordero había emitido pagos indebidos de licencias acumuladas.

61. Ramos Rosado también tuvo acceso y leyó el informe de auditoría CP13-19 del 18 de julio de 2013 de la Oficina del Contralor, donde se detallaban los hallazgos de deficiencias cuando el Dr. Cordero dirigía el recinto de Utuado.

62. Al día siguiente, el 27 de julio de 2021, luego de tener acceso a los reportajes de noticias y a las publicaciones en redes sociales antes descrita, "varios miembros del CGE-RUM remitieron un correo electrónico al resto de la membresía interina presentando una carta para repudiar la selección del Dr. Cordero como presidente interino de la UPR".

63. El codemandado Ramos Rosado, como presidente interino del CGE-RUM, dispuso que la carta se tramitaría "como una moción y [entonces] se llevó a cabo un referéndum electrónico, vía la plataforma de 'Google Forms', para que fuese atendida por la membresía del cuerpo estudiantil, como se hace por uso y costumbre con este tipo de mociones electrónicas".66

64. El cuerpo interino del CGE-RUM, en votación secreta, aprobó la moción de repudio en donde los votos "A favor" representaron un 73.3%, los votos en "En contra" un 20% y los votos "Abstenidx" un 6.7%.

65. El codemandado Ramos Rosado no recuerda cómo votó en relación con esa moción.

66. Ese 27 de julio de 2021, el CGE-RUM, divulgó el comunicado oficial el cual se publicó ese mismo día "con la firma del CGE-RUM" con relación a la presidencia

interina de la UPR en donde se mencionó al Dr. Cordero. Junto a la certificación que lo aprobó (Certificación 22-04), la cual fue firmada por Ramos Rosado en carácter de presidente interino por el cuerpo carecer de una secretaría interina en ese momento".

67. La Certificación 22-04 "valida la aprobación de la moción por el cuerpo y es uso y costumbre que se emita con la firma de la persona que tiene el rol de validar los resultados de la votación emitida".

68. El comunicado oficial contiene la siguiente expresión:

El Dr. Cordero fue mencionado en un Informe de Auditoría de la Oficina del Contralor de Puerto Rico por gestión como Rector de la Universidad de Puerto Rico en Utuado. Dicho informe señala incumplimiento de las disposiciones reglamentarias sobre el envío de contratos a la Oficina del Contralor de Puerto Rico, falta de controles internos relacionados con el manejo de transacciones electrónicas, pagos indebidos en liquidación de licencia ordinaria acumuladas por personal docente, entre otros.

El Dr. Cordero también ha sido señalado recientemente tanto de hostigamiento hacia estudiantes mientras fungía como catedrático de la UPR de Río Piedras en el 2018 y del encubrimiento de este tipo de casos mientras fue Rector de la UPR de Utuado.

69. El codemandado Ramos Rosado no redactó el comunicado oficial.

70. El 27 de julio de 2021, tan pronto se publicó el comunicado, se compartió igualmente por la cuenta oficial de Twitter de la CGE-RUM.

71. Ramos Rosado "republicó (re-tweet) la comunicación del CGE-RUM en su cuenta personal de Twitter como hacía e hizo durante su incumbencia con todos los comunicados, actividades y gestiones que llevaba a cabo el CGERUM en su deber y funciones de informar a la comunidad estudiantil a la que representaba".

72. El codemandado Ramos Rosado no fue entrevistado por ningún medio de prensa con relación al comunicado del CGE-RUM publicado el 27 de julio de 2021.

73. El Dr. Cordero entiende que el comentario de la estudiante en la red social de Twitter es "incorrecta pero no difamatoria".

74. El demandante no consultó a conocedores del área de las comunicaciones ni realizó ningún estudio para auscultar si su reputación pudo afectarse por el contenido de comunicado oficial del CGE-RUM ni de su republicación (retweet) en la red social de Twitter por parte del codemandado Ramos Rosado.

**D. Determinaciones de hechos con relación a moción dispositiva presentada por Metro**

75. El 25 de julio de 2021, los Representantes Estudiantiles de la Junta de Gobierno circularon un comunicado de prensa que fue posteriormente publicado en la cuenta oficial de Twitter de los representantes estudiantiles a las 6:57 pm.

76. El 25 de julio de 2021, luego de la publicación del Comunicado de prensa de los Representantes Estudiantiles de la Junta de Gobierno, Metro publicó a las 8:41 pm (hora militar 20:41) una noticia titulada "Estudiantes ante Junta de Gobierno UPR señalan falta en candidato(s) recomendado para presidencia interina" ("Noticia del 25 de julio").

77. El Dr. Cordero se enteró de la Noticia del 25 de julio, por una búsqueda que hizo personalmente y no por un tercero.

78. El Comunicado REJG expresa que "el Dr. Cordero cuando fungió como rector de la UPR Utuado fue señalado por la Oficina del Contralor por mal manejo de liquidaciones del personal".

79. La Oficina del Contralor de Puerto Rico realizó y publicó el Informe de Auditoría CPA-13-19 el 18 de junio de 2013 de la Universidad de Puerto Rico en Utuado para el periodo del 1 de julio de 2009 al 31 de diciembre de 2012 al cual la autorización de una liquidación de licencia ordinaria, a un empleado docente que fungió como rector, por parte del Presidente de la UPR, no fue realizada conforme a lo establecido en

el Reglamento General, por lo que el pago de la segunda liquidación no procedía.

80. El Dr. Cordero admitió que fungió como Rector desde el 10 de agosto de 2004, y renunció a su puesto el 15 de noviembre de 2009 y es el empleado docente que el Informe hace referencia en la página 20 y 21.

81. El 27 de julio de 2021, Metro publicó una noticia titulada "Reacciones mixtas en la comunidad universitaria a designación de presidente interino" ("Noticia del 27 de julio").

82. El Dr. Cordero se enteró de la Noticia del 27 de julio, por una búsqueda que hizo personalmente y no por un tercero.

83. De la Noticia del 27 de julio, el Dr. Cordero admitió que el contenido que entiende como difamatorio son únicamente las citas que se le atribuyen a Fabiana Marini y Javier Córdova.

84. El Dr. Cordero admitió que el contenido difamatorio de la Noticia del 27 julio son citas e información que le proveyeron al periodista de Metro.

> P. Y estas tres ocasiones que identifica, ¿son citas e información que le proveen estas personas al periodista?
>
> R. Sí

85. El Dr. Cordero admitió que las referencias a expresiones difamatorias de la Noticia del 27 de julio no fueron declaraciones del periodista de Metro.

86. El Dr. Cordero admitió no contar con evidencia de que Metro conociera que la información publicada en la Noticia del 27 de julio fuera falsa.

87. El Dr. Cordero admitió no contar con evidencia de que Metro tuviera alguna duda o serias dudas de que lo publicado en la Noticia del 27 julio no fuera cierto.

88. El 30 de julio de 2021, Metro publicó una noticia titulada "UPR podría revertir designación de César Cordero como presidente interino" por Sadot Santana Miranda (Noticia del 30 de julio).

89. Metro entrevistó a Fabiana Marini e incluyó expresiones del Comunicado UPRM en la Noticia del 30 de julio.

90. El Dr. Cordero admitió que el contenido difamatorio que se hace en la Noticia del 30 de julio, son las expresiones de Fabiana Marini:

P Del contenido de esta publicación o las referencias a las que se hace, ¿qué contenido difamatorio tiene, si alguno?

R El contenido difamatorio que identifico es la aseveración que se hace al referirse a una entrevista con la Presidenta del Consejo de Río Piedras, Srta. Fabiana Marini, donde se indica que ésta tronó contra el nombramiento de Cordero, y añade, debido a múltiples señalamientos de hostigamiento contra Cordero.

91. El Dr. Cordero admitió que no conoce al personal de Metro ya bien sea los periodistas, reporteros o editores personalmente.

**E. Moción en solicitud de sentencia sumaria presentada por Rivera Velázquez y Rivas Hernández**

92. Jorge L. Rivera Velázquez y Eliud R. Rivas Hernández fueron electos como representantes estudiantiles graduado y subgraduado, respectivamente, ante la Junta de Gobierno de la UPR para el período entre el 1 de julio de 2021 y el 30 de junio de 2022.

93. Rivera Velázquez y Rivas Hernández juramentaron a sus respectivos cargos entre el 5 y el 6 de julio de 2021.

94. El 25 de julio de 2021, Rivera Velázquez y Rivas Hernández publicaron un comunicado de prensa titulado "Representantes estudiantiles ante la Junta de Gobierno hacen señalamientos ante los candidatos recomendados para la presidencia interina de la UPR". El comunicado expresa lo siguiente:

**[San Juan, Puerto Rico]** Los Representantes Estudiantiles ante la Junta de Gobierno señalan faltas en los candidatos recomendados a presidente interino de la UPR. Mañana, 26 de julio de 2021, la Junta de Gobierno de la Universidad de Puerto Rico (UPR) se reunirá de manera extraordinaria para seleccionar a la persona que ocupará el cargo de presidente de la Institución

tras la destitución del Dr. Jorge Haddock el pasado 8 de julio. Hasta el momento solo dos nombres serán recomendados por el comité de búsqueda, estos son el Dr. José [sic] Cordero, exrector de UPR Utuado y el Dr. Brad Weiner, quien fue Decano de la Facultad de Ciencias Naturales del Recinto de Río Piedras.

En primera instancia, el Dr. Weiner no debería ser recomendado por la Junta de Gobierno, ya que en el pasado fue señalado por irregularidades con fondos otorgados por la National Sciences Foundation (NSF). Estos señalamientos le cost[aron] a la UPR aproximadamente $8 millones de dólares y la paralización de fondos adicionales por parte de la NSF. "La Junta de Gobierno claramente no debe considerar la recomendación del Dr. Weiner pues no representa los ideales de un académico y menos de un buen administrador; mucho menos en momentos que la UPR tiene ante sí una gran cantidad de fondos federales a raíz de los eventos en los pasados años", sostuvo Jorge Rivera, representante estudiantil.

Por otra parte, el Dr. Cordero, cuando fungió como rector de la UPR Utuado fue señalado por la Oficina del Contralor por mal manejo de liquidaciones de personal. "Entendemos que la UPR necesita una persona que concilie, armonice y escuche los reclamos de la comunidad universitaria; que trabaje en aras de los ideales universitarios y más en momentos críticos ante el nuevo inicio del año académico", mencionó Eliud Rivas, representante estudiantil.

La UPR y su comunidad universitaria requiere de una persona que conozca la institución y sobre todo pueda conciliar los reclamos que la comunidad ha estado reclamando en los pasados años. La institución no necesita más personas que fomenten la animosidad, la falta de supervisión, la política partidista y la falta de transparencia como la que ha destacado esta administración hasta este momento.

95. El comunicado fue redactado por ambos Rivera Velázquez y Rivas Hernández y la información allí contenida surgió de la búsqueda que ambos realizaron.

96. Para redactar la única oración del comunicado que alude directamente al Dr. Cordero Montalvo, Rivera Velázquez y Rivas Hernández habían leído y utilizaron el Informe de Auditoría CP-13-19 del 18 de junio de 2013, sobre el Recinto de Utuado de la Universidad de Puerto Rico, emitido por la Oficina de la Contralora de Puerto Rico.

97. El Informe de Auditoría CP-13-19 del 18 de junio de 2013 auditó el período comprendido entre el 1 de julio de 2009 y el 31 de diciembre de 2012.

98. El informe incluye, como Hallazgo Núm. 6, varios señalamientos bajo el título de "Pagos indebidos en liquidación de licencias ordinarias acumuladas por personal docente que cesaron en puestos de confianza".

99. En particular, en el Hallazgo 6 del referido informe se expresa lo siguiente:

Examinamos los expedientes de las liquidaciones de nueve empleados docentes que cesaron en sus puestos de confianza del 16 de noviembre de 2009 al 25 de diciembre de 2011. El examen de las referidas liquidaciones reveló lo siguiente:

1) Un empleado docente que fungió como Rector desde el 10 de agosto de 2004, renunció a su puesto el 15 de noviembre de 2009 para reintegrarse a la cátedra. A dicha fecha, este tenía acumulados 82.85 días de licencia ordinaria. Del 16 de noviembre de 2009 al 20 de enero de 2010, este disfrutó de 34 días de licencia ordinaria y el 28 de enero de 2011 recibió un pago por $11,516, por concepto de la liquidación correspondientes a 26 días (34 + 26 = 60) lo cual totalizaba la cantidad máxima (60 días) de licencia ordinaria acumulada a pagar. El 15 de junio de 2011 el Presidente de la UPR autorizó por escrito el pago de una segunda liquidación por $8,864, correspondientes a 22.85 días (en exceso de los 60 días) por el mencionado concepto. El examen reveló que la autorización emitida por el Presidente de la UPR no fue

realizada conforme a lo establecido en el Reglamento General, por lo que el pago de la segunda liquidación no procedía.

100. El Dr. Cordero Montalvo es el "empleado docente que fungió como Rector desde el 10 de agosto de 2004" y "renunció a su puesto el 15 de noviembre de 2009 para reintegrarse a la cátedra", al que alude el Hallazgo 6 del citado Informe de Auditoría CP-13-19 del 18 de junio de 2013.

101. La Oficina del Contralor estimó en el Informe de Auditoría CP-13-19 de 18 de junio de 2013 que el referido pago fue realizado en violación a los artículos 57.4.1 y 97.5 del Reglamento General de la Universidad de Puerto Rico, aprobado el 10 de diciembre de 2006, así como al Artículo X G.5 del Reglamento General de Finanzas y Contabilidad del Consejo de Educación Superior, emitido el 1 de marzo de 1985.

102. El Informe de Auditoría CP-13-19 del 18 de junio de 2013 también indica que fue remitido, en calidad de borrador, al Dr. Cordero Montalvo, y que éste sometió una contestación mediante carta del 11 de marzo de 2013.

103. El Informe de Auditoría CP-13-19 del 18 de junio de 2013 también señala que los comentarios remitidos por el Dr. Cordero Montalvo fueron tomados en consideración en la redacción del informe final.

104. Finalmente, el Informe de Auditoría CP-13-19 del 18 de junio de 2013 señala que la Dra. Yanaira Vázquez Cruz, Rectora del Recinto de Utuado de la UPR para la fecha de notificación del borrador del informe, aceptó el Hallazgo 6 como cierto.

105. El comunicado de prensa publicado por Rivera Velázquez y Rivas Hernández fue publicado en la cuenta oficial de los representantes estudiantiles ante la Junta de Gobierno de la UPR en la red social Twitter.

106. Rivera Velázquez y Rivas Hernández utilizaban dicha cuenta oficial para tener comunicación con el estudiantado y para poder mantener a los estudiantes informados.

107. Como parte de sus trabajos en el comité, Rivas Hernández votó a favor de la candidatura del Dr.

Cordero Montalvo y votó en contra de la candidatura del Dr. Weiner.

108. La decisión de Rivas Hernández de votar a favor de la recomendación del Dr. Cordero Montalvo tomó en cuenta su experiencia académica, su experiencia administrativa, su relación con los estudiantes, así como la opinión de los integrantes de los Consejos de Estudiantes de los recintos.

109. Aprobado el informe, se pasó a la discusión y votación para la presidencia interina de la UPR. Como parte de la discusión, el parlamentarista de la Junta de Gobierno, el profesor Miguel Santiago, explicó que los miembros de la Junta debían votar a favor de una sola persona, y que, en caso "de que algún miembro no desee votar por ninguno de los candidatos, se resuelve luego de la votación".

110. Concluida la votación, el Dr. Cordero Montalvo recibió seis (6) votos a favor, el Dr. Weiner recibió cinco (5) votos a favor y tres (3) personas emitieron votos en contra de los dos (2) candidatos.

111. El Sr. Santiago, parlamentarista de la Junta de Gobierno de la UPR razonó que los tres votos en contra de ambos candidatos "no se cuentan para el conteo final de la votación" y que la Junta "los puede declarar como ausente[s] al no participar de la votación".

112. Rivas Hernández apoyó la interpretación del parlamentarista durante la reunión, presentando la postura de parte de los representantes estudiantiles, presentó una moción de cierre para concluir el asunto, y Rivera Velázquez secundó la moción.

113. Durante la reunión extraordinaria, Rivera Velázquez y Rivas Hernández emitieron su voto a favor del nombramiento del Dr. Cordero Montalvo, luego de haber realizado una consulta con los representantes de los consejos generales de estudiantes de los once recintos de la UPR, y una mayoría de éstos apoyar la designación del demandante.

114. Dado que el proceso fue acelerado, la comunicación de Rivera Velázquez y Rivas Hernández de consulta con los Consejos de Estudiantes se hizo de

manera no oficial, y no necesariamente todos los consejos se expresaron.

115. Ese mismo día, Rivera Velázquez y Rivas Hernández sometieron a la Junta de Gobierno de la UPR sus respectivos votos explicativos en torno a la referida designación.

116. En el caso de Rivera Velázquez, su voto explicativo expresó lo siguiente:

Como muchos saben nos encontramos ante una decisión que resulta difícil, por no mencionar imposible, sobre qu[é] persona debe ocupar la presidencia de la UPR de forma interina durante los próximos meses ante la destitución de lo que[,] a mi parecer[,] ha sido una de las peores presidencias, la del Dr. Jorge Haddock. Al momento nos toca tomar una decisión entre lo que considero ¿Quién es el menos malo? Difícil ante la situación histórica que se encuentra la UPR. Esas personas son el Dr. Cesar Cordero, exrector de UPR Utuado señalado en el pasado por irregularidades en el manejo de liquidaciones a empleados y, el segundo, el Dr. Brad Weiner, quien fue señalado por la National Sciences Fou[n]dation y eso implic[ó] que la UPR perdiera acceso en el 2012 a $33 millones de dólares para investigación y tuviera que pagar $8 millones para remediar el daño causado por este individuo en conjunto con otras dos personas. La universidad no merece una elección que se reduzca a quien es menos malo. Nuestra institución requiere de una persona que la conozca y a su vez armonice, concilie y escuche a la comunidad universitaria y los reclamos que por mucho tiempo hemos venido apalabrando. S[é] que personas que pudieran representar estos ideales no estuvieron a la disposición de asumir el cargo por razones personales u otras que no vienen al caso mencionar. Los estudiantes reconocemos que ninguno de los candidatos representa el mejor apoyo e interés para nuestro sector, mas, sin embargo, la sola consideración del Dr. Wiener no debe tan siquiera pasar al pleno de la Junta de

Gobierno, por lo antes expuesto, y habiendo consultado a los Consejos Generales de Estudiantes y recabando su insumo y siendo mayoría favoreciendo al Dr. Cordero[,] dispongo que mi voto es A favor de [é]ste.

117. Por su parte, el voto explicativo de Rivas Hernández expresó lo siguiente:

Por Cuanto: Dado a sus competencias en los distintos cargos administrativos que ocupó en la UPR RP, Cayey y Utuado y el listado de logros alcanzados en los mismos[.] Por Cuanto: En lo que a m[í] respecta, se pudo desenvolver mejor en la entrevista[.] Por Cuanto: Presenta una versión holística dentro del ámbito universitario[.] Por Cuanto: Existe un corto tiempo que apremia a una decisión, y la opción de candidatos es limitada[.] Por Cuanto: A pesar de no ser considerado como dentro del ideal universitario[.]

Por Tanto: Mi determinación, luego de una consulta con la comunidad estudiantil y teniendo la mayoría de la aprobación, el voto ser[í]a para el Dr. Cordero[.]

118. Con posterioridad a la reunión extraordinaria, Rivera Velázquez advino en conocimiento de dos publicaciones realizadas desde la página de una cuenta de la red social Twitter identificada como "nat @_nvtalya".

119. En la primera, publicada el 5 de abril del 2018, una persona publicó el siguiente mensaje: "ok les cuento que hoy mi profe de cifi se puso a jugar con mi pelo, like he literally wrapped his hand around my hair. luego comenzó a decirme ricitos de oro. i am so done with this shit".

120. En la segunda, publicada el 26 de julio de 2021, una persona escribió el siguiente mensaje: ".... y ahora es el presidente interino de la UPR".

121. El Dr. Cordero Montalvo advino en conocimiento de esas publicaciones en la semana comenzando el 27 de julio de 2021, interpretó que la referencia a "presidente interino" en la segunda publicación se refería a su persona y, luego de indagar sobre el

particular, logró identificar que el primer mensaje fue publicado por una exestudiante y está relacionado a una demonstración como parte de un curso de ciencia física que éste ofreció en el Recinto de Río Piedras de la UPR durante un semestre condensado de marzo a mayo de 2018.

122. El 27 de julio de 2021, Rivera Velázquez envió un correo electrónico al presidente de la Junta de Gobierno de la UPR, el ingeniero Colón Beltrán, a la vicepresidenta del cuerpo, la Dra. Velasco Bonilla, y al Secretario Ejecutivo de la Junta de Gobierno, en el cual incluyó las capturas de pantallas que había recibido de las antes mencionadas publicaciones y expresó lo siguiente:

Saludos,

Espero se encuentren bien. Traigo ante ustedes estos comentarios altamente preocupantes que he le[í]do sobre el Dr. Cordero cuando era rector de UPR Utuado y como profesor de Ciencias Física en [la] Facultad de Estudios Generales del Recinto de Río Piedras. En mi caso soy bien cel[o]so cuando se hacen estos señalamientos pues se deben [investigar] por[] los debidos canales establecidos[,] ya sea la Certificaci[ó]n 130, 140 y la reciente 133. Hago un llamado al comit[é] ejecutivo de la JG a que uno advenga en conocimiento de esto y s[é] que me dir[á]n que tengo que ir a los recintos, por lo que, a las personas que han se[ñ]alado les he dicho que as[í] lo hagan y usen los canales correspondientes. Lo traigo a su atención antes de que explote en la prensa. Jam[á]s apoyaría a una persona que haya cometido dichos actos. Agradezco cualquier insumo o recomendaciones que tengan para abordar este particular.

Muchas gracias.

123. Al día siguiente, el 28 de julio de 2021, Rivera Velázquez envió un correo electrónico a los integrantes de la Junta de Gobierno de la UPR en el que señaló lo siguiente:

Saludos,

Espero se encuentren bien al momento de recibir este email. Por este medio deseo hacer las siguientes dos solicitudes al pleno:

1. Se convoque una Reunión Extraordinaria no m[á]s tardar de la semana próxima para abrir el proceso de B[ú]squeda y Consulta de Presidente en propiedad para la Universidad de Puerto Rico.

2. Se lleve a cabo una reunión de la Junta de Gobierno para dialogar sobre las alegaciones que han transcendido sobre el electo presidente interino y, a su vez, dialogar sobre los próximos pasos a seguir según menciona un comunicado de prensa de esta junta que v[i] recientemente. Me parece que en aras de responder al mejor interés institucional debemos llevar a cabo un diálogo sosegado de lo que transcurri[ó] en la reunión extraordinaria y lo que ha salido estos dos días. Debemos todos velar por el bien de nuestra universidad.

Reitero mi compromiso para con este cuerpo y sobre todo para mis estudiantes y universidad.

Quedo de ustedes.

124. El 29 de julio de 2021, la Sa. Magdalisse Ramos, Secretaria Ejecutiva de la Junta de Gobierno de la UPR, envió una invitación para una conversación por video conferencia para ese mismo día a las 5:00 p.m., con el ingeniero Colón Beltrán.

125. Ese mismo día, el ingeniero Colón Beltrán envió un mensaje a los integrantes de la Junta de Gobierno en relación a la conversación pautada. El mensaje indica lo siguiente:

Tendremos una discusión abierta de dos temas para ir desarrollando sus respectivas agendas:

Presidencia Interina: repasar donde estamos y opciones de allegar cursos de acción. Lograr vías de llenar prontamente la vacante, ya sea con el electo Dr. Cordero [u] otra opción[.] Presidencia Permanente: comenzar a plantearnos el proceso de búsqueda y forma: búsqueda de candidatos locales y de Estados Unidos. Espero que cada cual pueda

opinar, tratando de mantener uso de tiempo para permitir a todos expresarse.

126. Durante la conversación celebrada el 29 de julio de 2021, el ingeniero Colón Beltrán informó a la Junta de Gobierno sobre la alegación de hostigamiento sexual que había circulado en redes sociales contra el Dr. Cordero Montalvo.

127. De igual forma, durante esa conversación, el Dr. Hernán Cestero, el licenciado Eliezer Ramos Parés y el Dr. Jorge Valentín reiteraron su impugnación de la designación del Dr. Cordero Montalvo.

128. Durante la conversación, el Lcdo. Alejandro Camporreale Mundo, integrante de la Junta de Gobierno, expresó que no podía nombrarse a una persona que tenía algún señalamiento sobre hostigamiento sexual, cuando es la propia Junta que aprueba las políticas en contra de este tipo de comportamiento. Por tal razón, el Lcdo. Camporreale Mundo solicitó se llevara a cabo una votación para dejar sin efecto el nombramiento del Dr. Cordero Montalvo como presidente interino de la UPR.

129. Al Dr. Cordero Montalvo no le consta que Rivera Velázquez o Rivas Hernández hicieran una solicitud expresa para reconsiderar su designación como presidente interino de la UPR, dado que no estuvo en la reunión celebrada por la Junta de Gobierno de la UPR.

130. A tales efectos, el 30 de julio de 2021, la Sra. Ramos remitió a los integrantes de la Junta, por instrucciones de su presidente, un referéndum electrónico para dejar sin efecto la designación del Dr. Cordero Montalvo como presidente interino de la UPR. El referéndum fue aprobado, por votación de nueve (9) a favor, y tres (3) en contra.

131. Como resultado de lo anterior, el 30 de julio de 2021, la Junta de Gobierno de la UPR expidió la Certificación Núm. 4 (2021-2022), mediante la cual se dejó sin efecto la designación del Dr. Cordero Montalvo como presidente interino de la UPR.

132. En esta ocasión, Rivera Velázquez y Rivas Hernández votaron a favor de dejar sin efecto el nombramiento del Dr. Cordero Montalvo, como

resultado de los nuevos señalamientos que habían surgido sobre su persona, y luego de haber recibido el insumo de representantes de los consejos generales de estudiantes de los once recintos de la UPR, una mayoría de los cuales se expresaron en contra de mantener la designación del demandante.

133. En el caso de Rivas Hernández, su decisión de votar a favor de dejar sin efecto la designación del Dr. Cordero Montalvo estuvo relacionada a los nuevos hallazgos en su contra, así como a la animosidad que había por parte del sector estudiantil.

134. En el caso de Rivera Velázquez, su voto cambió por el peso de la queja de hostigamiento sexual, y porque cambió de parecer en cuanto a la cantidad de votos que era requerida para el nombramiento del Dr. Cordero Montalvo a la presidencia interina de la UPR, luego de consultar los manuales de procedimientos parlamentarios de Reece Bothwell y Robert.

135. El 23 de agosto de 2021, el Dr. Cordero Montalvo envió una comunicación electrónica a la redacción del periódico Metro, y en particular, a la atención del periodista Manuel Guillama Capella, a la que se adjunta un escrito informativo y reflexivo, titulado "Expresiones en torno a mi reciente disponibilidad para la presidencia interina de la UPR" y con fecha del 15 de agosto de 2021, sobre todo el proceso relacionado a su aspiración a la presidencia interina de la UPR.

136. El 6 de septiembre de 2021, el Dr. Cordero Montalvo envió una nueva comunicación electrónica a Metro, esta vez dirigida a la editora del periódico, la Sra. Aiola Virella, a la que anejó una versión revisada del escrito informativo y reflexivo previamente enviado el 23 de agosto de 2021, titulado "Expresiones en torno a mi reciente disponibilidad para la presidencia interina de la UPR" y esta vez con fecha del 16 de agosto de 2021.

137. El Dr. Cordero Montalvo modificó el escrito informativo y reflexivo anejado, no para cambiar su reflexión, pero para hacer una expresión más clara de lo que quiere asegurarse de que se conozca como contenido de su punto de vista.

138. El 28 de septiembre de 2021, el Dr. Cordero Montalvo envió una nueva comunicación electrónica a la Sra. Virella, a la cual anejó un escrito titulado "Disponibilidades universitarias y el precio a pagar", para su consideración de posible publicación en el periódico Metro.

139. En o alrededor del mes de septiembre o octubre de 2021, el Dr. Cordero Montalvo envió a algunos colegas del claustro del Sistema UPR y a algunas amistades del pasado una versión del escrito informativo y reflexivo sobre todo el proceso relacionado a su aspiración a la presidencia interina de la UPR, que anteriormente había enviado a Metro.

140. El 18 de febrero de 2022, el Dr. Cordero Montalvo envió a Rivera Velázquez un correo electrónico al que anejó dos escritos: (1) una carta del 9 de febrero de 2022, dirigida a los miembros del Comité de Búsqueda y Consulta para la Presidencia de la UPR, y (2) un documento titulado "Expresiones en torno a mi reciente disponibilidad para la presidencia interina de la UPR (Ampliadas)", que es una versión ampliada del escrito informativo y reflexivo sobre todo el proceso relacionado a su aspiración a la presidencia interina de la UPR, que anteriormente había enviado a Metro, a colegas del claustro del Sistema UPR y a algunas amistades del pasado.

141. El documento titulado "Expresiones en torno a mi reciente disponibilidad para la presidencia interina de la UPR (Ampliadas)" tiene fecha del 16 de agosto de 2021, el Dr. Cordero Montalvo reconoce que la ampliación o revisión de ese documento debió haberlo hecho en alguna fecha posterior, posiblemente más cercana al 9 de febrero de 2022, fecha de la carta dirigida a los miembros del Comité de Búsqueda y Consulta para la Presidencia de la UPR.

142. El Dr. Cordero Montalvo no conoce a Rivera Velázquez, ni ha tenido comunicación directa con él.

143. Rivera Velázquez no conoce personalmente al Dr. Cordero Montalvo.

144. Fuera de la participación en su entrevista por videoconferencia ante el Comité de Búsqueda y

Consulta para la presidencia de la UPR, el Dr. Cordero Montalvo no ha tenido otra interacción con Rivas Hernández ni tiene conocimiento personal sobre él.

145. Rivas Hernández no conoce personalmente al Dr. Cordero.

El 18 de febrero de 2025, la parte apelante presentó una *Solicitud* de *Reconsideración,* la cual fue declarada No Ha Lugar por el Tribunal mediante *Resolución* emitida el 26 de marzo de 2025.

Inconforme con dicha determinación, el 25 de abril de 2025, el señor Cordero Montalvo compareció ante nosotros mediante el recurso de apelación de epígrafe y planteó la comisión de los siguientes errores:

> **Erró el Honorable Tribunal de Primera Instancia al denegar la solicitud de remedios al amparo de la Regla 36.6 de Procedimiento Civil que efectuó el Demandante con respecto a la solicitud de sentencia sumaria presentada por el codemandado Metro, determinación que resultó en la privación del derecho que le asiste de efectuar un descubrimiento de prueba (toma de deposiciones) para obtener la prueba necesaria para establecer las controversias sobre hechos materiales a las causas de acción ejercidas contra Metro.**

> **Erró el TPI al dictar sentencia sumaria de desestimación de la Demanda adjudicando en contra del Demandante elementos subjetivos de intención propósitos mentales sobre la malicia en la difusión de información falsa y difamatoria sobre el Demandante, aun cuando el factor credibilidad es esencial para poder adjudicar justicieramente la presencia de estos elementos y haciendo caso omiso a la prueba en los autos que demuestra de manera indubitada la existencia de controversia genuina y fundamentada sobre hechos materiales y pertinentes a las causas de acción incoadas por el Apelante.**

El 12 de mayo de 2025, la señora Marini Martínez presentó su *Alegato.* Sostuvo, entre otros planteamientos, que el señor Cordero Montalvo no puede rebatir el carácter privilegiado de sus expresiones, ni establecer la existencia de negligencia alguna de su parte, y mucho menos demostrar malicia real. Añadió, además, que

el apelante tampoco evidenció la existencia de daño alguno como consecuencia de lo diseminado.

Luego de varios tramites procesales, el 27 de mayo de 2025, Metro presentó su *Alegato en Oposición a Apelación*. Alegó, en síntesis, que la parte apelante sí tuvo la oportunidad de deponer a los testigos de Metro, así como también recibió las Contestaciones del Primer Pliego de Interrogatorios, Producción de Documentos y Requerimiento de Admisiones. Por tanto, arguyó que la Regla 36, *supra*, resulta inaplicable a los hechos del caso. Además, manifestó que el foro primario no realizó inferencias favorables a la parte apelada, sino que aplicó el estándar de prueba exigido en las acciones por difamación. Adujo que dicho foro consideró las admisiones del propio demandante, rendidas bajo juramento, las cuales evidenciaron que este no tenía prueba alguna de que Metro conociera o tuviera dudas razonables sobre la veracidad de las declaraciones publicadas, ni que actuara con la intención de difamarlo o causarle daño.

El 26 de junio de 2025, el señor Ramos Rosado presentó su *Alegato en Oposición a la Apelación*. Alegó, en esencia, que las expresiones contenidas en el Comunicado oficial de la CGE-RUM fueron realizadas en el marco de un "procedimiento cualquiera autorizado por ley", razón por la cual gozan de "una protección global para todo lo allí expresado". Añadió que al ser estas expresiones privilegiadas, no se publicaron bajo los preceptos que exige una causa de acción de difamación.

Ese mismo día, los señores Rivera Velázquez y Rivas Hernández presentaron su *Alegato en Oposición*. Arguyeron, en resumen, que el señor Cordero Montalvo no logró demostrar con prueba clara, robusta y convincente que estos publicaron el comunicado de prensa con malicia real y grave menosprecio a la verdad. De igual forma adujeron que este último no demostró que el

comunicado de prensa de estos le causó daños reales, ni contribuyó a que se retirara su designación como presidente interino de la UPR.

Con el beneficio de la comparecencia de las partes, el Derecho y jurisprudencia aplicables, resolvemos.

II.

A.

Como sabemos, la sentencia sumaria es un mecanismo procesal provisto en la Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 36, cuyo fin es proveer una solución justa, rápida y económica de los litigios. *Serrano Picón v. Multinational Life Ins.*, 212 DPR 981, 992 (2023); *González Santiago v. Baxter Healthcare*, 202 DPR 281, 290 (2019); *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 109 (2015). A tenor, dicho mecanismo procesal permite que un tribunal, disponga parcial o totalmente de litigios civiles en aquellos casos en los que no exista alguna controversia material de hecho que requiera ventilarse en un juicio plenario y el derecho así lo permita. *León Torres v. Rivera Lebrón,* 204 DPR 20, 41 (2020). La sentencia sumaria procede cuando "no existen controversias *reales y sustanciales* en cuanto a *los hechos materiales*, por lo que lo único que queda por parte del poder judicial es aplicar el Derecho". *Meléndez González et al. v. M. Cuebas, supra*, pág. 109 (citando a *Oriental Bank v. Perapi et al.*, 192 DPR 7, (2014); *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 430 (2013); *Nieves Díaz v. González Massas*, 178 DPR 820, 847 (2010)).

Al interpretar la precitada Regla el Tribunal Supremo ha expresado que debe dictarse sentencia sumariamente cuando el tribunal sentenciador tiene ante sí, de manera incontrovertible, la verdad sobre todos los hechos esenciales. *E.L.A. v. Cole,* 164 DPR 608, 625 (2005). De manera que, "una controversia de hecho es suficiente para derrotar una moción de sentencia sumaria [...] cuando causa en el tribunal una duda real y sustancial sobre algún

hecho relevante y pertinente". *Pepsi-Cola v. Mun. Cidra et al.,* 186 DPR 713, 756 (2012). Se entiende que un hecho material es aquél que puede afectar el resultado de la reclamación acorde al derecho sustantivo aplicable. *Ramos Pérez v. Univisión,* 178 DPR 200, 213 (2010). Por lo que, no deberá dictar sentencia sumaria cuando: 1) existen hechos materiales controvertidos; 2) hay alegaciones afirmativas en la demanda que no han sido refutadas; 3) surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material; o 4) como cuestión de derecho no procede. *Pepsi-Cola v. Mun. Cidra, supra,* pág. 757; *S.L.G. Szendrey-Ramos v. Consejo Titulares,* 184 DPR 133, 167 (2011).

Al atender la moción de sentencia sumaria, el Tribunal deberá asumir como ciertos los hechos no controvertidos que se encuentren sustentados por los documentos presentados por la parte promovente. *E.L.A. v. Cole, supra,* pág. 626. No obstante, "la omisión en presentar evidencia que rebata aquella presentada por el promovente, no necesariamente implica que procede dictar sentencia sumaria de forma automática". *Mun. de Añasco v. ASES,* 188 DPR 307, 327 (2013) (citando a Córdova *Dexter v. Suncn. Ferraiuoli,* 182 DPR 541, 556 (2011)). A su vez, corresponde al juzgador actuar guiado por la prudencia y ser consciente de que su determinación podría implicar que se prive a una de las partes de su "día en corte", elemento esencial del debido proceso de ley. *León Torres v. Rivera Lebrón, supra,* pág. 44.

Cónsono con lo anterior, nuestro más alto foro ha resuelto que, existen litigios y controversias que "por su naturaleza no resulta aconsejable resolverlos mediante una sentencia dictada sumariamente; ello, en vista de que en tales casos un tribunal difícilmente podrá reunir ante sí toda la verdad de los hechos a través de affidávits, deposiciones o declaraciones juradas". *Jusino et als. v. Walgreens,* 155 DPR 560, 579 (2001) (citando a *Soto v. Hotel*

*Caribe Hilton*, 137 DPR 294, 311 (1994); *García López v. Méndez García*, 88 DPR 363, 379 (1963). Dicho foro ha identificado como posibles controversias de este tipo aquellas que incluyen: "elementos subjetivos, es decir, aquellas en las que el factor credibilidad juegue un papel esencial o decisivo para llegar a la verdad, y donde un litigante dependa 'en gran parte de lo que extraiga del contrario en el curso de un juicio vivo'. *Audiovisual Lang. v. Sist. Est. Natal Hnos.*, 144 DPR 563, 577 (1997).

En lo pertinente, la Regla 36 de Procedimiento Civil, *supra*, impone unos requisitos de forma con los cuales hay que cumplir al momento de promover una solicitud de sentencia sumaria, a saber: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción sobre la cual se solicita la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (5) las razones por las cuales se debe dictar la sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. 32 LPRA Ap. V, R. 36.3; *Oriental Bank v. Caballero García*, 212 DPR 671, 679 (2023). Si la parte promovente incumple con estos requisitos, "el tribunal no estará obligado a considerar su pedido". *Meléndez González et al. v. M. Cuebas, supra,* pág. 111.

Asimismo, la parte que se opone a una sentencia sumaria tiene que cumplir con los requisitos de la precitada Regla 36, *supra. Oriental Bank v. Caballero García, supra,* pág. 680. En otras palabras, la parte que desafía dicha solicitud no podrá descansar en las aseveraciones o negaciones consignadas en su alegación. *León*

*Torres v. Rivera Lebrón, supra,* pág. 43. Así pues, en la oposición a una solicitud de sentencia sumaria, la parte promovida debe "puntualizar aquellos hechos propuestos que pretende controvertir y, si así lo desea, someter hechos materiales adicionales que alega no están en disputa y que impiden que se dicte sentencia sumaria en su contra". *Id.*, pág. 44. Entiéndase que, "la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa". *Id.* De lo contrario, corre el riesgo de que se dicte sentencia en su contra. *Oriental Bank v. Caballero García, supra,* pág. 680.

B.

Al evaluar una moción de sentencia sumaria, el Tribunal de Apelaciones está en la misma posición del Tribunal de Primera Instancia. *Serrano Picón v. Multinational Life Ins., supra,* pág. 993; *Meléndez González et al. v. M. Cuebas, supra,* pág. 118. Tómese en cuanta que, nuestra revisión es una *de novo* y debemos basar nuestro análisis por las disposiciones de la Regla 36 de Procedimiento Civil, *supra,* así como de su jurisprudencia interpretativa. A tenor, nuestro más alto foro ha esbozado los criterios que deben guiar esta revisión. *Roldán Flores v. M. Cuebas et al.,* 199 DPR 664, 679-680 (2018); *Meléndez González et al. v. M. Cuebas, supra,* págs. 118-119. Por ello, el Tribunal de Apelaciones debe:

1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra,* y la jurisprudencia le exigen al foro primario;

2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra;*

3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, *supra,* de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos y;

4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia. *Roldán Flores v. M. Cuebas et al., supra*, pág. 679.

Ahora bien, estamos limitados en cuanto a: (1) que no podemos tomar en consideración evidencia que las partes no presentaron ante el foro primario, y (2) tampoco adjudicar los hechos materiales en controversia, ya que ello le compete al tribunal de instancia luego de celebrado un juicio en su fondo. *Meléndez González et al. v. M. Cuebas, supra*, pág. 118. Al realizar nuestra revisión *de novo* debemos "examinar el expediente de la manera más favorable hacia la parte que se opuso a la Moción de Sentencia Sumaria en el foro primario, llevando a cabo todas las inferencias permisibles a su favor". *Id.*

En este contexto, cuando no pueden obtenerse declaraciones juradas, la Regla 36.6 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.6, dispone lo siguiente:

> Si de las declaraciones juradas de la parte que se oponga a la moción resulta que ésta **no puede**, por las razones allí expuestas, presentar mediante declaraciones juradas hechos esenciales para justificar su oposición, el tribunal **podrá** denegar la solicitud de sentencia o posponer su consideración, concediéndole a la parte promovida un término razonable para que pueda obtener las declaraciones juradas, tomar deposiciones, conseguir que la otra parte le facilite cierta evidencia o dictar cualquier otra orden que sea justa. (Énfasis nuestro).

A tono con lo previamente expuesto, nuestro más alto foro resolvió en *García Rivera et. al. v. Enríquez*, 153 DPR 323, 339-340 (2001), que la precitada regla resulta aplicable en aquellos casos "en que el promovido por una moción de sentencia sumaria **no ha tenido una adecuada oportunidad de conseguir prueba para apoyar alguno de los hechos esenciales que justifican su posición**". *Id.* pág. 339 (Énfasis nuestro). Así las cosas, la Regla 36.6 de Procedimiento Civil, *supra*, provee al Tribunal de Primera

Instancia un mecanismo para remediar tal circunstancia. *Id.* pág. 340. En particular, el tribunal expresó que:

> [C]onfrontado el tribunal con una solicitud de sentencia sumaria prematura, éste puede, en el ejercicio de su discreción, posponer la evaluación de la moción o denegarla en esa etapa de los procedimientos, amén de que el propósito de las reglas de procedimiento es hacer viable el que los tribunales hagan justicia al resolver las controversias. **No obstante, el Tribunal de Primera Instancia debe tomar aquellas medidas que garanticen que no se recurra a la Regla 36.6,** *supra***, como un ardid para demorar la solución final del asunto. Razón por la cual, es necesario que las razones que aduzca la promovida en apoyo de su contención sean razonables y adecuadas**. Comenta Cuevas Segarra que ´[t]odo se reduce a fijar límites de razonabilidad a las actuaciones de la parte que se opone a que se dicte sentencia sumaria´. *Id.* (Citas omitidas).

### B.

La Sección 4 del Art. II de nuestra Constitución dispone que "[n]o se aprobará ley alguna que restrinja la libertad de palabra o de prensa. . .". Art. II, Sec. 4, Const. PR, LPRA, Tomo 1. Por su parte, la Sección 8 del mismo artículo establece que "[t]oda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar". *Id.* De esta última disposición emana la protección constitucional contra actos difamatorios. Ciertamente, "[l]as acciones de difamación plantean la necesidad de balancear el derecho a la libre expresión y la libertad de prensa, que comprende el interés del pueblo en fomentar el debate vigoroso sobre cuestiones de interés público, y el derecho a la intimidad de los individuos". *Gómez Márquez et al. v. El Oriental*, 203 DPR 783, 795 (2020) (citando a *Maldonado y Negrón v. Marreo y Blanco,* 121 DPR 705, 713 (1988)). "[E]s a nuestro ordenamiento jurídico al que debemos acudir para sopesar los intereses involucrados en casos de difamación. En este campo, la jurisprudencia norteamericana tiene solamente carácter ilustrativo o persuasivo, salvo las limitaciones impuestas por la Constitución

federal y a la jurisprudencia interpretativa del Tribunal Supremo de Estados Unidos". *Colón Pérez v. Televicentro de P.R.*, 175 DPR 690, 709 (2009) (citando a *Clavell v. El Vocero de P.R.*, 115 DPR 685 (1984)).

La Ley Libelo y Calumnia de Puerto Rico, Ley de 19 de febrero de 1902, regula lo concerniente a reclamaciones por difamación y reconoce una acción civil por daños y perjuicios al amparo del Art. 1802 del Código Civil de Puerto Rico de 1930, disposición que actualmente se encuentra recogida en el Art. 1536 del Código Civil de 2020. 32 LPRA secs. 3141-3149. Dicho estatuto es aplicable en cuanto sea compatible con los principios constitucionales que rodean la acción por difamación. J.J. Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos*, Bogotá, Ed. TEMIS, 2010, pág. 1023.

Es norma reiterada que, en el contexto de una reclamación por difamación, el mecanismo de la sentencia sumaria "es parte integral de la protección constitucional disponible al demandado". *Colón Pérez v. Televicentro, supra,* págs. 724-725. En estos casos, para establecer qué procede en derecho para dictar sentencia sumariamente:

> [S]e puede demostrar que no existe controversia real sustancial en cuanto a ningún hecho material y que, como cuestión de derecho, los sucesos alegados no son suficientes para establecer causa de acción alguna, ya sea porque se incumplen los requisitos necesarios o se configura una defensa afirmativa.
>
> .        .        .        .        .        .        .
>
> [De otra parte, se puede alegar y demostrar] que el demandante no tiene evidencia suficiente para establecer los requisitos de su reclamación, es decir, que carece de prueba para demostrar algún elemento esencial de la causa de acción. (Citas omitidas) *Id.*

A tal efecto, al ser la sentencia sumaria parte de la protección constitucional de los medios de comunicación en los casos de libelo, el tribunal, en lugar de examinar la evidencia que se le presente de la forma más favorable a la parte demandante promovida, "exigirá a

esta mayor rigor en su oposición para que pueda derrotar la moción de sentencia sumaria de la prensa". *Id.* pág. 724.

Los elementos constitutivos de la causa de acción por difamación dependerán, en primera instancia, de si el demandante es una figura privada o una figura pública. Para que una figura privada tenga éxito en su causa de acción por libelo, deberá probar: (1) que la información es difamatoria y falsa, (2) que la publicación se hizo de forma negligente, y (3) que se le causaron daños reales. De manera que, en casos de figuras privadas, dicha acción es una de daños y perjuicios basada en negligencia. *Pérez Rosado v. El Vocero de P.R.*, 149 DPR 427 (1999). Véase *Meléndez Vega v. El Vocero,* 189 DPR 123, 196 (2013); *Villanueva v. Hernández Class*, 128 DPR 618, 642-643 (1991); *González Martínez v. López,* 118 DPR 190, 192-193 (1987); *Clavell v. El Vocero de P.R.*, *supra*, pág. 692.

Los criterios que deben considerarse para determinar negligencia en la publicación de información difamatoria en cuanto a una persona privada son: "(i) la naturaleza de la información publicada, la importancia del asunto de que se trata y especialmente si ésta es difamatoria de su propia faz y puede preverse el riesgo de daños, (ii) el origen de la información y confiabilidad de su fuente y (iii) la razonabilidad del cotejo de la veracidad de la información tomando en consideración el costo en términos de dinero, tiempo, personal, urgencia de la publicación, carácter de la noticia y cualquier otro factor pertinente". *Pérez Rosado v. El Vocero de P.R.*, *supra*, pág. 448 (Énfasis en el original omitido)

**En cambio, para que un funcionario público prospere en un caso de difamación tiene que probar, con prueba directa o circunstancial que: (1) la expresión difamatoria es <u>falsa</u>, (2) que se publicó a sabiendas de que era falsa o con grave menosprecio de su falsedad o veracidad, es decir, con <u>malicia real</u>, y (3) que dicha publicación le causó <u>daños reales</u>.** *Meléndez Vega v. El*

*Vocero de PR*, 189 DPR 123, 148-149 (2013) (citando a *Garib Bazain v. Clavell*, 135 DPR 475 (1994); *Villanueva v. Hernández Class*, *supra*, pág. 642; *García Cruz v. El Mundo, Inc.*, 108 DPR 174, 178 (1978); *New York Times Co. v. Sullivan*, 376 U.S. 254, 288-292 (1964)) (Énfasis nuestro).

En particular, le malicia real debe probarse mediante evidencia clara y convincente; es decir, debe surgir de hechos específicos, ya que no es suficiente afirmar que la publicación fue maliciosa. *Garib Bazain v. Clavell, supra*, pág. 484. Tómese en cuenta que, **la malicia real nunca se puede presumir. Por el contrario, como mínimo, hay que probar que el demandado tuvo serias dudas sobre la certeza de la información**. *Id.* pág. 484 (Énfasis nuestro). En tal sentido, **nuestra Ley de Libelo y Calumnia,** *supra***, ha sido modificada por el nuevo concepto de la libertad de prensa** garantizada por la Constitución de Puerto Rico y por la Primera Enmienda de la Constitución de Estados Unidos. *García Cruz v. El Mundo, Inc., supra*, pág. 180 (Énfasis nuestro). Así pues, es imprescindible que el demandado efectivamente tenga serias dudas sobre la certeza de la publicación. *Id.* pág. 181. Por ello, se ha resuelto que:

> [A]un prueba de mala voluntad u odio no satisface de por sí el grado constitucionalmente requerido de la prueba de malicia. *García Cruz v. El Mundo, Inc., supra*, pág. 181. Además, el 'grave menosprecio' a que se refiere la doctrina 'no se mide por lo que un hombre razonablemente prudente hubiese publicado o hubiese investigado antes de la publicación'. Tiene que existir 'prueba suficiente que permita concluir que el demandado abrigaba serias dudas sobre la certeza de la información'. *García Cruz v. El Mundo, Inc., supra*, pág. 181. **La controversia sobre la suficiencia de la prueba para establecer la malicia real y quién es figura pública es una cuestión de derecho**. (Citas omitidas) *Garib Bazain v. Clavell, supra*, págs. 484-485 (Énfasis nuestro).

A tenor, los rasgos peculiares de la figura pública son: "1) especial prominencia en los asuntos de la sociedad, 2) capacidad

para ejercer influencia y persuasión en la discusión de asuntos de interés público y 3) participación activa en la discusión de controversias públicas específicas con el propósito de inclinar la balanza en la resolución de las cuestiones envueltas". *Garib Bazain v. Clavell, supra*, págs. 482-483 (citando a *Torres Silva v. El Mundo, Inc.*, 106 DPR 415, 422 (1997)). Respecto al alcance del derecho a la libertad de expresión, se ha enfatizado la importancia y necesidad de un "debate robusto y abierto sobre la cosa pública, debate que. . .'bien puede incluir ataques vehementes, cáusticos y a veces desagradablemente cortantes. . .' ". *Garib Bazain v. Clavell, supra*, pág. 485 (citando a *Soc. de Gananciales v. López*, 116 DPR 112, 115 (1985).

Asimismo, la libertad de prensa, protegida a través del requisito de malicia real, no solo ampara la publicación de información correcta. "[L]as manifestaciones erróneas son inevitables en la discusión de los asuntos públicos. **El propósito de la garantía constitucional es mantener un clima abierto para la discusión franca y vigorosa de los asuntos de interés público y de la conducta y ejecutoria de los funcionarios públicos**. . .Por eso, la libertad de prensa incluye tanto la manifestación veraz como la incorrecta". *Id.* pág. 485 (citando a *Zequeira Blanco v. El Mundo, Inc.*, 106 DP 432, 436 (1977) (Énfasis nuestro).

III.

En su primer señalamiento de error, la parte apelante arguye, en síntesis, que el foro *a quo* abusó de su discreción al denegar su solicitud de remedios al amparo de la Regla 36.6 de Procedimiento Civil, *supra*, presentada en oposición a la petición de sentencia sumaria instada por Metro. No le asiste la razón. Veamos.

Como relacionamos previamente, el 17 de julio de 2024, la parte apelante le solicitó al Tribunal de Primera Instancia autorización para tomar deposiciones a los testigos notificados por

Metro, solicitud que fue denegada mediante *Orden* emitida el 30 de julio de 2024. En particular, dicho foro resaltó que, previamente se había extendido el periodo de descubrimiento de prueba.[14] No obstante, confirmó que el término prorrogado para el descubrimiento de prueba culminó. Por tanto, concluyó que **no existía justificación** para permitir las deposiciones al no haberse tomado en el término concedido "por una razón optativa" de la parte apelante.[15]

En este sentido, la parte apelante afirmó que, con el consentimiento expreso de la representación legal de Metro y ante la expectativa de un acuerdo entre las partes, se dejaron sin efecto las correspondientes deposiciones, ya que "haría innecesario llevar a cabo ese descubrimiento de prueba".[16] Nótese que las deposiciones que fueron programadas y posteriormente canceladas lo fueron a solicitud de la parte apelante.

Ahora bien, es norma reiterada que, corresponde al Tribunal de Primera Instancia adoptar las medidas necesarias para evitar que la Regla 36.6, *supra*, sea utilizada **como un ardid para demorar la solución final del asunto**. **Por ello, las razones que exponga la parte promovida como justificación de su planteamiento  deben ser razonables y adecuadas**. *García Rivera et. al. v. Enríquez, supra*, pág. 340.

A la luz de lo anterior, no se vislumbra ningún atisbo de abuso de discreción del foro primario al denegar la solicitud de extensión del periodo de descubrimiento de prueba, ante la ausencia de una razón justificada. Por tanto, el alegado error no se cometió.

---

[14] Véase Apéndice 22-A del recurso, págs. 1083a-1083b; Véase también, *Orden* del Tribunal de Primera Instancia SUMAC Entrada 64 en la cual dispone lo siguiente: "La solicitud conjunta trastoca completamente el itinerario previamente dispuesto. No obstante, el Tribunal está en disposición de extender el descubrimiento para la culminación de las deposiciones de 29 de febrero de 2024 hasta el 5 de abril de 2024. En vista de ello, culminado el descubrimiento tendrán las partes hasta el 30 días para presentar cualquier moción dispositiva".

[15] *Id.*; Véase también, Apéndice 12 del recurso, págs. 195-197; Apéndice 22 del recurso, págs. 1050-1083.

[16] Recurso de Apelación, págs. 1-25.

En su segundo señalamiento de error, el apelante alega, en esencia, que el foro primario erró al dictar sentencia sumaria desestimando la *Demanda Enmendada*. Sostiene que el tribunal concluyó erróneamente que no existían elementos subjetivos de intención y propósito mental relacionados con la malicia real en la difusión de información falsa y difamatoria sobre su persona, ignorando la prueba que demostraba la existencia de controversia sobre hechos materiales. No le asiste la razón. Veamos.

Tal como se indicó anteriormente, en una demanda de difamción, la sentencia sumaria constituye un mecanismo integral de la protección constitucional disponible al demandado. *Colón Pérez v. Televicentro, supra*, págs. 724-725. Asimismo, para que un funcionario público --como lo es la parte apelante-- prospere en un caso de difamación tiene que probar, con prueba directa o circunstancial que, entre otros elementos, que la información se publicó a sabiendas de que era falsa o con malicia real.

Por el contrario, la parte apelante expresó en su recurso que la doctrina recogida en *Soto v. Caribe Hilton*, 137 DPR 294 (1994) "demuestra que es indebido utilizar el mecanismo de sentencia sumaria para adjudicar el elemento de malicia que es extremadamente subjetivo". Asimismo, manifestó que el foro primario no aplicó la alegada presunción de malicia real que, según sostiene, emana de la Sección 5 de la Ley de Libelo y Calumnia, *supra*. Conviene reiterar, que la malicia real nunca se puede presumir. Por ello, la parte apelante, en un intento frustrado por inducir a error a este Tribunal, presenta sus argumentos al margen de la normativa aplicable.

Luego de evaluar las mociones de sentencia sumaria, sus anejos y demás escritos relacionados, a la luz de los criterios aplicables conforme a la Regla 36, *supra*, y según lo establecido en *Meléndez González et al. v. M. Cuebas, supra,* resolvemos que el

dictamen apelado refleja una correcta aplicación del derecho vigente, en atención a la prueba presentada ante el foro recurrido. Toda vez que la parte apelante no controvirtió los hechos establecidos por la parte apelada, el error señalado no se cometió. Concluimos que procede confirmar la desestimación de la *Demanda Enmendada.*

IV.

Por los fundamentos antes expuestos, se *confirma* el dictamen recurrido.

El Juez Hernández Sánchez disiente sin escrito.

La Jueza Mateu Melendez concurre sin escrito.

Notifíquese.

Lo acordó el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones